**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **GBSM SERVICE AND MANAGEMENT, LLC and BLUDWORTH MARINE LLC,** | § | |
| | § | |
| **Plaintiffs,** | § | **NO. 1:23-cv-00190-MAC** |
| **v.** | § | |
| | § | **ADMIRALTY** |
| **M/V RCM 245, her tackle, furniture, Apparel, appurtenances, etc., *in rem, et al.*** | § | |
| | § | |
| **Defendants.** | § | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

COME NOW, Specially Appearing Defendants RCM 245 LLC and REBEKAH ROSE LLC, as claimants of the M/V RCM 245 and TUG REBEKAH ROSE, as well as Defendant Rose Cay Maritime, LLC, ("RCM") in personam, (collectively "Defendants") by and through undersigned counsel, and submit the following proposed findings of fact and conclusions of law.

**Proposed Findings of Fact**

1. Plaintiff GBSM Service and Management LLC ("GBSM") is a Texas company with its principal place of business in Houston, Texas.

2. Gregg Bowman is the principal and owner of GBSM.

3. RCM 245 LLC owns the barge, the RCM 245.

4. The RCM 245 (the "Vessel") is a 40,221 dwt, 260,000 bbl clean tanker barge which is 554.80 ft long, 93.20 ft wide, and 45.0 feet deep, which was built in 1997. The Vessel bears primary vessel number 1050073.

5. RCM is a Delaware registered company, which manages and operates a fleet of Jones Act vessels, and at all relevant times was the manager of the RCM 245.

6. The RCM 245 arrived in Galveston on approximately December 28, 2022 and subsequently docked at Galveston Pier 41 on January 4, 2023.

7. When the RCM 245 arrived in Galveston, it had remaining jet fuel in the port side tanks 6, 7, and 8.

8. From the period of approximately January 4, 2023 – February 9, 2023, the RCM 245 was located at Pier 41 in Galveston for ship repair work.

9. Bludworth Marine LLC ("Bludworth") was hired to perform repair work and services to the Vessel. Bludworth provides shipyard repair services in the Gulf region.

10. RCM hired Oscar Balderas ("Balderas") as a port engineer in December 2022.

11. Mr. Balderas reported to Chad Wozniak and Terry Hickey at RCM, among others within RCM shore-side management.

12. Mr. Balderas was assigned to the RCM 245 and tasked with overseeing the investigation and repair of various issues which had been identified by the crew during the preceding voyage by the vessel.

13. Mr. Balderas had responsibility for coordinating services, parts, and repairs for the Vessel, but knew that at all relevant times he was required to obtain the express authority of shoreside management at RCM before agreeing to any proposal, bid, contract, or invoice.

14. Mr. Balderas contacted Mr. Bowman on Sunday, January 8, 2023, to obtain a quote for the removal of a cargo of jet fuel from the Vessel which needed to be returned to the Magellan Terminal in Houston.

15. Mr. Bowman did not ask for any details about the barge, did not visit the barge, did not ask for a general arrangement for the barge, or any other information prior to issuing the quote.

16. Mr. Bowman and his employee Shauni Snorgrass prepared the quote based on anticipated charges by third party vendors that would have to be hired to complete the work.

17. GBSM did not have any trucks or equipment necessary to perform the services for which it was being hired.

18. Mr. Bowman provided two quotes on January 8, 2023.

19. The first quote was for two trucks to pump off the cargo from the RCM 245 for an all-in price of $3,978.

20. The second quote made later the same day amended the quote to pump off the cargo and deliver it to Valero at a price of $6,730 per day.

21. The quote also included a truck surcharge of $175 per hour for any time over eight (8) hours).

22. RCM agreed to the second quoted rate for two trucks (for full 8 hour days) for the removal of the cargo from the barge and delivery to the Magellan Terminal, *i.e*. $6,730 per day.

23. GBSM and RCM never entered into a written contract for the removal of the jet fuel.

24. The first day that Mr. Bowman was onsite, January 9, 2023, he had visual confirmation of the size of the vessel and its arrangement.

25. Mr. Bowman never provided written notice that the removal of the cargo was going to cost more than the quoted day rate that had been agreed on January 8, 2023.

26. The first three (3) days, i.e. January 9 – 11, 2023, no product was removed from the Vessel.

27. Once GBSM hired and scheduled the right equipment and vacuum trucks to be on the jobsite to be able to meet the needs of the size of the barge, the removal of the product took less than two full days.

28. By the sixth day, i.e. January 14, 2023, GBSM had removed the remaining slops and water from the tank.

29. The cargo removal and delivery portion of the project was completed between January 9 – 14, 2023.

30. Following that completion of the cargo removal, the scope of the work to be performed by GBSM was amended.

31. Specifically, GBSM was requested to provide and did provide services to remove water and slops generated by valve testing and tank cleaning operations which were occurring onboard.

32. This tank water removal work occurred during the course of January 15, 2023 – February 9, 2023.

33. None of the trucks and other equipment required to perform this work were owned by GBSM, but were all subcontracted out through third parties.

34. Despite the nature and scope of the work changing, GBSM did not provide any revised, amended, or new quotes to RCM for the removal of water and slops from the tank.

35. RCM had a reasonable expectation that the work was being performed at the original quoted "removal" day rate of $3,978, and for time which was more than eight (8) hours at the quoted hourly rate of $175 per truck.

36. GBSM did not provide an updated bid, email, have a signed contract, or purchase order for the removal of the water and slops or provide any notice in writing (or otherwise) as to what amounts GBSM would charge for same.

37. RCM never approved "24/7" or "around-the-clock" truck services once the cargo was removed on January 15, 2023.

38. There was no emergency and no need for trucks and personnel to be standing by idling while waiting for the next tank to empty.

39. After the few days for the cargo removal, GBSM personnel were not onsite for the remainder of the tank water/slops removal operations.

40. Mr. Balderas confirmed that no one at RCM ever said that the job was a "time is of the essence" job and/or that there was a requirement to "expedite" the repairs.

41. Mr. Balderas knew that he had to receive approval from RCM management in order to agree to work and/or price quotes on the RCM 245 project.

42. GBSM knew that Mr. Balderas had to obtain approval from RCM shoreside management to approve work, quotes, costs, and/or charges.

43. GBSM never provided daily reports, updates, or tickets demonstrating the progress made, product offloaded, and/or estimated charges incurred.

44. Mr. Balderas knew that he did not have final approval authority on pricing, contracts, or invoices and that all work had to be approved by RCM management.

45. RCM management never approved the GBSM invoices, as the charges were far in excess of the original quoted work and GBSM repeatedly failed to provide requested back-ups and supports for the work allegedly performed.

46. GBSM issued invoice GM13254 dated January 13, 2023 in the amount of $75,000.00.

47. The invoice was not approved by RCM and GBSM failed to provide the back-ups and supports for the alleged charges.

48. Invoice GM13254 represented work done to remove the cargo of jet fuel from the vessel.

49. Fair and reasonable charges for the work should have been in the range of $15,000 - $20,000, had GBSM properly staffed the job, as the quoted rate was $6730 (8 hour day, two trucks) and an additional hourly rate of $175 per hour. Once the proper equipment was onsite, the project took less than 2.5 days to complete.

50. GBSM provided no written notice, contract, quote, or purchase order for any other, different, or higher charges.

51. Even taking a conservative approach, strictly based on the hours contained in the work described in Invoice GM13254, the charges should have been no more than $47,030 (i.e. the max day rate for six (6) days and 38 additional truck hours documented).

52. GBSM issued invoice GM13261 dated January 22, 2023 in the amount of $150,383.21, purported for work during the period of January 14 – 22, 2023.

53. There was no active or professional management of the staffing of trucks at the jobsite and/or the services being provided by GBSM.

54. The invoice was not approved by RCM and GBSM failed to provide the back-ups and supports for the alleged charges.

55. GBSM Invoice 13261 was entitled “Final Bill RCM 245 (Vessel Repair)”, however GBSM refused to provide written confirmation that all claims would be satisfied in exchanged for payment of $150,000.

56. GBSM charged exorbitant rates without any reasonable grounds to support same and the rates were far in excess of the reasonable, market rates for similar services for work in the region.

57. Trucking rates by the third-party vendors were fair and reasonable for the work being performed, but were then marked-up by GBSM far beyond any industry standard. For

example:

a. Bluebonnet Petrochemical Solutions charged $95.00 per hour for trucks.

b. Greyhound Environmental Consulting LLC charged $102.50 per hour for trucks.

c. PBI International charged $125.00 per hour for trucks.

d. Specialty Energy Services charged $130.00 per hour for trucks.

e. Interstate Petroworks LLC charged $115.00 per hour for trucks.

f. Sun Coast Resources Inc. charged $0.15 per gallon for potable water.

58. GBSM issued invoice GM13263 dated February 9, 2023 in the amount of $196,212.84, purportedly covering the work performed during the period of January 23 – February 9, 2023.

59. The invoice was not approved by RCM and GBSM failed to provide the back-ups and supports for the alleged charges.

60. GBSM charged exorbitant rates without any reasonable grounds to support same and the rates were far in excess of the reasonable, market rates for similar services for work in the region.

61. Most egregiously, GM13263 included a charge for delivery of potable water in the amount of $15,740 (*i.e.* $15,000 for 6000 gallons of water and $740 for delivery), but the back-up invoicing showed that GBSM only paid their vendor, Sun Coast Resources Inc. $1,129.70 for the water (*i.e.* $900 for 6000 gallons of water and $229.70 for delivery).

62. GBSM was never authorized to just have trucks idling and on stand-by 24 hours a day for four (4) weeks.

63. There were no written quotes, bids, documents, emails, text messages, contracts, or purchase orders authorizing 24/7, round-the-clock charges for trucks.

64. The total number of hours charged for the performance of the services was not approved, was not required, was not necessary, did not add value to the vessel, was unreasonable, and was the result of bad-faith mismanagement of the project by GBSM.

65. The total amount of third-party vendor charges for the services performed at the RCM 245 project was no more than $215,701.10.

66. Notwithstanding, GBSM charged exorbitant, excessive, and unreasonable rates which were never agreed by Defendants or their representatives.

67. Had GBSM properly managed the project, the total amount for out-of-pocket costs and expenses which were reasonable for the work performed would have been approximately $150,000.

68. Even assuming a reasonable mark-up for GBSM's arranger services, which in the industry for the Gulf region is no more than 10-20%, the total amount invoiced to RCM should not have exceeded $165,000 - $180,000.

## **Proposed Conclusions of Law**

1. Jurisdiction in this case is based on 28 U.S.C. § 1333, and §31341 of the Commercial Instruments and Maritime Lien Act, 46 U.S.C. §§ 31301-31343 ("CIMLA"), and was brought under the provisions of Rule C of the Federal Rules of Civil Procedure Supplemental Rules for Certain Admiralty or Maritime Claims. This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. U.S. general maritime law controls all substantive issues.

2. Jurisdiction over the *in rem* and *in personam* Defendants is not disputed. Defendants posted substitute security to stand in place of the RCM 245, so that the vessel could be released from arrest. Defendant's deposit of $575,000 remains in the custody of the Clerk of

the Court and is invested in the Court Registry Investment System in an interest bearing account.

3. 46 U.S.C.A. § 31342 provides in relevant part:

> a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—
>
> (1) has a maritime lien on the vessel;
> (2) may bring a civil action in rem to enforce the lien; and
> (3) is not required to allege or prove in the action that credit was given to the vessel.

4. 46 U.S.C. § 31341 of CIMLA states as follows:

> (a) The following persons are presumed to have authority to procure necessaries for a vessel:
> (1) the owner;
> (2) the master;
> (3) a person entrusted with the management of the vessel at the port of supply; or
> (4) an officer or agent appointed by--
> (A) the owner;
> (B) a charterer;
> (C) an owner pro hac vice; or
> (D) an agreed buyer in possession of the vessel.

5. In order to establish a maritime lien for necessaries, a supplier must show (1) that the goods or services were "necessaries"; (2) that the charges are reasonable in amount; and, (3) that they were ordered by someone with the appropriate authority. *See Belcher Co. of Ala., Inc. v. M/V MARATHA MARINER*, 724 F.2d 1161, 1164 (5th Cir. 1984) and *Farwest Steel Corp. v. Barge SEA SPAN 241*, 769 F.2d 620, 623 (9th Cir. 1985).

6. No one with authority to bind the vessel ever instructed GBSM to provide 24/7 standby service, round-the-clock trucking service, and/or any other emergency or rush application of the project for the period of January 15, 2023 – February 9, 2023. Accordingly, such services were done without authority by GBSM itself and no maritime lien attaches for those services. *Am. Oil Trading, Inc. v. M/V SAVA*, 47 F. Supp. 2d 348, 352 (E.D.N.Y. 1999)

("[L]ack of authority to order necessaries defeats a maritime lien.").

7. Plaintiff's charges for the work and services provided were unreasonable. Where there is no contractual agreement as to the amount, the "reasonableness" of charges, in the maritime context, is measured by whether the charges are "customary," *Ex parte Easton*, 95 U.S. 68, 77, 24 L. Ed. 373 (1877) and "in accord with prevailing charges for the work done and the materials furnished," *Shelly Tractor & Equip. Co. v. The Oil Screw Boots*, 140 F. Supp. 425, 426 (E.D.N.C. 1956); *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005).

8. To satisfy the "reasonableness" burden, Plaintiff must show that the amount charged is comparative to what other competitors would have charged for similar work or materials. *Id.*; *see also Crescent Ship Serv. v. M/V Mitera Vassiliki*, 1995 U.S. Dist. LEXIS 9130, No. 94-2391 (E.D. La. June 28, 1995); *Hampton Berm. Ltd. v. M/V Star Siranger*, 2008 U.S. Dist. LEXIS 32548, *12 (SDTX 2009).

9. The failure to present evidence that the charges were reasonable, precludes recovery on plaintiff's maritime claim. *See TTT Stevedores of Tex., Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1141 (5th Cir. 1983).

10. Plaintiff's own evidence and the amounts charged by the vendors which actually performed the work establishes the lack of reasonableness of Plaintiff's charges, which were exorbitant, not authorized, unreasonable, not customary, and presented in bad faith. Accordingly, Plaintiff's claim must fail, or in the alternative, be severely reduced to the actual reasonable value of the limited service provided by GBSM.

11. The reasonable value of the services rendered by Plaintiff to the RCM 245 and therefore the value of the maritime lien is limited to $180,000.

12. Attorneys' fees are not "necessaries" as defined by CIMLA and as such, Plaintiff is not entitled to recovery of its attorneys' fees. *Gulf Marine and Indus. Supplies, Inc. v. Golden Prince M/V*, 230 F.3d 178, 180-181 (5th Cir. 2000); *Bradford Marine, Inc, v. M/V SEA FALCON*, 64 F.3d 585 (11th Cir. 1995); *James Creek Marina v. VESSEL MY GIRLS*, 964 F. Supp. 20 (D.D.C. 1997); *see also J.P. Provos Maritime S.A*, 1999 U.S. Dist. LEXIS 12012, 1999 WL 558151 at *2 (EDLA 1999)("[T]he court finds that legal services for the collection of a debt for necessaries are not for the benefit of the vessel and thus they are not necessaries subject to a maritime lien."); *Inland Credit Corp. v. M/T Bow Egret*, 552 F.2d 1148, 1155 (5th Cir. 1977) (affirming the district court's decision that parties asserting maritime liens for necessaries could not receive attorneys' fees *in rem*).

13. A suit on sworn account pursuant to Rule 185 of the Texas Rules of Civil Procedure is not a separate independent cause of action, but rather is a procedural tool that serves to limit the evidence necessary to establish a *prima facie* right to recovery against a person or entity who defaults on certain types of accounts. *Rizk v. Fin. Guardian Ins. Agency, Inc.*, 584 S.W.2d 860, 862 (Tex. 1979); *Williams v. Unifund CCR Partners Assignee of Citibank*, 264 S.W.3d 231, 234 (Tex. App.--Houston [1st Dist.] 2008, no pet.); *see* Tex. R. Civ. P. 185. The Fifth Circuit has affirmed that view of Rule 185. *Sunshine Traders of El Paso, Inc. v. Dolgencorp, Inc.*, 219 F. App'x 375, 377 (5th Cir. 2007) (per curiam) ("Rule 185 is a procedural rule…").

14. Accordingly, none of the procedural requirements of Rule 185 are applicable or binding on Federal Courts. *See e.g., Steves & Sons, Inc. v. Trinity Glass Int'l, Inc.*, No. CIV.A. SA06CV357XR, 2007 U.S. Dist. LEXIS 38236, 2007 WL 1556743, at *4 (W.D. Tex. May 25, 2007); *Steelplan, Ltd. v. Steel Plan Australia Pty. Ltd.*, No. 3:02-CV-0470-P, 2003 U.S. Dist.

LEXIS 10838, 2003 WL 21499303, *9 (N.D. Tex. June 25, 2003)).[1]

15. Even though Plaintiff failed to plead common law suit on sworn account in its Verified Complaint, Texas common law does provide such a remedy. The elements of a suit on an account include: (1) sale and delivery of the merchandise; (2) that the amount of the account is ***just***, that is, that prices charged are in accordance with an express contract, if one exists, or in the absence of a contract, that the charges are usual, customary or reasonable; and (3) that the amount is unpaid. *Blue Bell, Inc. v. Isbell*, 545 S.W.2d 563, 565 (Tex. Civ. App. - El Paso 1976, no writ); *see also Robbins Hardwood Flooring, Inc. v. Bolick Distributors, Corp.*, No. CIV. 3:02-CV-1124-H, 2003 U.S. Dist. LEXIS 4149, 2003 WL 21730142, at *2 (N.D. Tex. Mar. 18, 2003) *aff'd in part*, 79 F. App'x 81 (5th Cir. 2003) (*citing Burch v. Hancock*, 56 S.W.3d 257, 264 (Tex. App.--Tyler 2001, no pet.)) (reciting three elements for an "action on sworn account").

16. Plaintiff must show that the Defendant agreed to pay the prices charged by the Plaintiff for the material sold, or that the prices were reasonable or customary. *Parker v. Center Grocery Company*, 387 S.W.2d 903 (Tex.Civ.App. -- Tyler 1965, no writ). One of the essential elements of the proof is the justness of the account. This can be shown in two ways: either that the prices charged were agreed upon by the parties, or, in the absence of an agreement, that the prices were usual, customary or reasonable. *Brooks v. Eaton Yale and Towne, Inc.*, 474 S.W.2d 321 at 323 (Tex.Civ.App. -- Waco 1971, no writ).

17. There was no agreement, written or oral, as to the prices charged by the Plaintiff in the GBSM invoices.

---

[1] Parenthetically, even though Rule 185 does not apply in Federal Court, Defendants filed verified answers denying Plaintiff's claims, including for the alleged suit on sworn account. Accordingly, when a sworn denial of the plaintiff's account is filed, the evidentiary presumption is destroyed and plaintiff is forced to introduce proof of its claim. TEX. R. CIV. P. 93(10); *Roberts Express, Inc. v. Expert Transp., Inc.*, 842 S.W.2d 766, 770 (Tex. App.--Dallas 1992, no writ)); *Rizk v. Financial Guardian Insurance Agency, Inc*., 584 S.W.2d 860, 862 (Tex. 1979).

18. The prices charged were not reasonable, just, or customary, as evidenced by the fact that Plaintiff over twice the amount of the actual costs in mark-up "arranger" fees compared to the invoicing and pricing provided by the eight (8) vendors that performed all of the work.

19. Moreover, Plaintiff charged for work which was not requested, needed, customary, or reasonable under the facts and circumstances. Accordingly, Plaintiff's claim for sworn account must be denied and dismissed.

20. To recover attorney's fees under section 38.001, a party must prevail on the underlying claim and recover damages. *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009).

21. "Whether a party prevails turns on whether the party prevails upon the court to award it something, either monetary or equitable." *Id*. at 655; *see also Farrar v. Hobby*, 506 U.S. 103, 111, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992) ("In short, a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.").

22. Where, as here, Plaintiff's Texas state law claim for suit on sworn account has been denied, Plaintiff is not permitted to recover attorney's fees under Texas Civil Practice and Remedies Code section 38.001.

23. Accordingly, Plaintiff shall take $180,000 from the funds in the Court Registry in full and final satisfaction of its maritime lien, and the remaining $395,000, plus any interest which has accrued shall be released and returned to Defendants.

Dated: December 5, 2024
Houston, Texas

Respectfully submitted,

CHALOS & Co, P.C.

By: /s/ Briton P. Sparkman
George M. Chalos, Esq.
Federal Bar No. 623727
*gmc@chaloslaw.com*
Briton P. Sparkman, Esq.
Federal Bar No. 1148116
*bsparkman@chaloslaw.com*
7210 Tickner Street
Houston, Texas 77055
Tel: (713) 574-9582
Fax: (866) 702-4577

*Attorneys For Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2024, the foregoing document was electronically filed with the Clerk of Court for the U.S. District Court, Eastern District of Texas, using the electronic case filing (ECF) system of the court. The electronic case filing system will send a "Notice of Electronic Filing" to the attorneys of record who have consented to accept service of this document by electronic means.

/s/ *Briton P. Sparkman*
Briton P. Sparkman