OSCAR BALDERAS  
GBSM SERVICE vs M/V RCM 245  
September 25, 2024  
1–4

### Page 1

```
             UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF TEXAS

GBSM SERVICE AND            )
MANAGEMENT, LLC, and        )
BLUDWORTH MARINE, LLC,      )
                            )
        Plaintiffs,         )
                            )  NO. 1:23-cv-00180-MAC
vs.                         )  ADMIRALTY
                            )
M/V RCM 245, her tackle,    )
furniture, apparel,         )
appurtenances, etc., in     )
rem, et al.,                )
                            )
        Defendants.         )

* * * * * * * * * * * * * * * * *
             DEPOSITION OF
             OSCAR BALDERAS
           SEPTEMBER 25, 2024
* * * * * * * * * * * * * * * * *

        DEPOSITION OF OSCAR BALDERAS, having been duly
sworn by Maria Menkin, Notary Public in and for the
State of Texas. The witness appeared at Killeen & Stern,
P.C., in Houston, Texas, from 1:08 p.m. to 5:10 p.m.,
pursuant to Texas Rules of Civil Procedure and any
provisions stated on the record or attached hereto.
```

### Page 2

```
              APPEARANCES OF COUNSEL
On behalf of Plaintiffs, GBSM Service and Management,
LLC, and Bludworth Marine, LLC:

     ROBERT J. KILLEEN, ESQ.
     KILLEEN & ASSOCIATES, P.C.
     1811 Bering Drive
     Suite 120
     Houston, Texas 77057
     713-626-5100
     rkilleen@killeen-law.com
     APPEARED IN PERSON

On behalf of Defendants, M/V RCM 245, her tackle,
furniture, apparel, appurtenances, etc., in rem, et al:
     BRITON P. SPARKMAN, ESQ.
     CHALOS & CO, P.C.
     7210 Tickner Street
     Houston, Texas 77055
     713-574-9454
     bsparkman@chaloslaw.com
     APPEARED IN PERSON

Also present:
     Greg Bowman
     Chelsey Gillespie, Law Clerk
```

### Page 3

INDEX TO EXAMINATION

| EXAMINATION OF OSCAR BALDERAS | PAGE |
|---|---|
| Direct Examination by MR. KILLEEN | 7 |
| Cross-Examination by MR. SPARKMAN | 61 |
| Redirect Examination by MR. KILLEEN | 168 |
| Recross-Examination by MR. SPARKMAN | 177 |
| Further Direct Examination by MR. KILLEEN | 181 |
| DEPOSITION ERRATA SHEET | 184 |
| CERTIFICATE OF DIGITAL REPORTER | 186 |
| FURTHER CERTIFICATION | 188 |
| CERTIFICATE OF TRANSCRIPTIONIST | 189 |

INDEX OF EXHIBITS

| PLAINTIFF'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | E-mail | 24 |
| Exhibit 2 | E-mail | 27 |
| Exhibit 3 | E-mail | 28 |
| Exhibit 4 | E-mail | 33 |
| Exhibit 5 | Approval History screenshot | 39 |
| Exhibit 6 | E-mail | 42 |
| Exhibit 7 | E-mail | 45 |
| Exhibit 8 | Confidential | 46 |
| Exhibit 9 | Screenshots | 50 |

### Page 4

INDEX OF EXHIBITS (CONT'D)

| DEFENDANT'S | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 10 | New Hire Packet | 86 |
| Exhibit 11 | February 15, 2023 Document | 163 |



Page 29

1  2023, until the time the RCM 245 departed and left
2  Galveston on or about February 9, 2023, did anyone at
3  RCM tell you that you did not have the authority to
4  instruct Mr. Bowman's company, GBSM, regarding repairs
5  to the RCM 245?
6      A. No, sir.
7      Q. Similar question, but different. From the
8  time you hired Mr. Bowman's company, GBSM, roughly
9  January 8, 2023, until the vessel, the RCM 245, left
10 Galveston on or about February 9, 2023, did anyone at
11 RCM tell you that you did not have the authority to
12 approve GBSM's services provided to the RCM 245?
13     A. No, sir.
14         MR. SPARKMAN: Objection. Form.
15 BY MR. KILLEEN:
16     Q. During this time period, January 8, 2023,
17 until the RCM 245 left, departed Galveston on or about
18 February 9, 2023, did anyone at RCM ever tell you there
19 was an issue with the services GBSM provided to you on
20 behalf of the RCM 245?
21     A. No, sir.
22     Q. During this same time period -- I'm sticking
23 in a narrow time period -- the retention of GBSM on or
24 about January 8, 2023, until the RCM 245 departed and
25 left Galveston on or about February 9, 2023, did anyone

Page 30

1  at RCM write to you and state Mr. Bowman's company had
2  overbilled RCM?
3      A. No, sir.
4      Q. Were you ever made aware that when the Rebekah
5  Rose and the RCM 245 arrived at Pier 41 in Galveston
6  for these repairs, that RCM had no monetary budget for
7  the work it needed?
8          MR. SPARKMAN: Objection.
9          THE WITNESS: No -- no, sir.
10 BY MR. KILLEEN:
11     Q. Hold on. Kind of organized today. Hold on a
12 second.
13         I just want to make sure this comes in at
14 trial. Hold on. I'm going to -- I'm going to read to
15 you the corporate testimony, the company testimony that
16 was given on February 26, 2024.
17         It's Page 101, Line 17. And my question is:
18 "Did Rose Cay have a monetary budget for the work it
19 thought was needed on the RCM 245 when she arrived in
20 Galveston on or about at Pier 41, January 4, 2023?" The
21 response was no.
22         Is that, to the best of your knowledge,
23 correct?
24     A. Correct.
25         MR. SPARKMAN: Objection. Form.

Page 31

1          THE WITNESS: Yes, sir.
2  BY MR. KILLEEN:
3      Q. During this time period, when the RCM 245
4  arrived in Galveston and up until the time she left on
5  or about February 9, 2023, did RCM ever create a budget
6  for the repair work the RCM 245 needed in Galveston?
7      A. No, sir.
8      Q. Did you, as the port engineer that Mr. Hickey
9  hired -- I think you testified three days before
10 Christmas in 2022 -- did you define the scope of work
11 necessary for the RCM 245 while she was in Galveston on
12 behalf of RCM?
13     A. Yes.
14     Q. Did anyone above you -- meaning somebody
15 that -- in a corporate or structural hierarchy might
16 have sat on a limb above you. Did anyone above you at
17 RCM, to your knowledge, disapprove of any of the work
18 you deemed necessary for the RCM 245 while she was in
19 Galveston?
20     A. No, sir.
21     Q. Did anyone at RCM ask you for purchase orders
22 regarding GBSM's work and services rendered to the RCM
23 245 while she was in Galveston?
24     A. No, sir.
25     Q. Did Mr. Wozniak -- and I hope I'm pronouncing

Page 32

1  it correctly. Did Chad Wozniak ever not approve the
2  work and services provided by GBSM to the RCM 245?
3          MR. SPARKMAN: Objection. Form.
4          THE WITNESS: He was never present there.
5  BY MR. KILLEEN:
6      Q. Let me ask a different question. Did
7  Mr. Woz -- I'm going to just say Chad. Did Chad ever
8  disapprove of services provided by GBSM to you on
9  behalf of the RCM 245 in writing?
10     A. No, sir.
11     Q. To the best of your recollection, at some time
12 during the second half of January 2023, did Mr. Wozi --
13 Woz -- did Chad leave RCM?
14     A. Yes, sir.
15     Q. I want to show you a document that I just have
16 a couple of questions about. I think I'm up to 4,
17 right?
18         MR. SPARKMAN: Yes.
19         MR. KILLEEN: Yeah. Thank you.
20         Briton, it's RCM 722 to RCM 723. And I'm --
21 I'm going to ask him about a January 27 e-mail from
22 Mr. John Parrot to him. Let me let you look at it. If
23 you can pass it to me.
24         Thank you. And I'll -- I'll ask you a
25 question and give it to you. Thank you.



Page 177

1  Q. Go ahead.
2  MR. SPARKMAN: Go ahead.
3  THE WITNESS: Because without him, I don't
4  think we ever would have finished. He was a big part
5  of the big group of the company, every -- all parties,
6  including myself, including the higher-ups of my
7  company. He provided, and everybody was aware of what
8  kind of service he was provided to us.
9     And just moving forward. I mean, he did a
10 great job for us.
11    MR. KILLEEN: Thank you. Let me see if
12 Mr. Briton has any more -- I mean, Mr. Sparkman has any
13 more questions.
14    MR. SPARKMAN: Yeah. Just a couple of
15 follow-up.
16            RECROSS-EXAMINATION
17 BY MR. SPARKMAN:
18  Q. Just turning your attention back to what was
19 marked as Defendant's Exhibit 40.
20  A. 40.
21  Q. Uh-huh. And I -- I'll just reorient you back
22 to the -- the Alex Parker e-mail.
23  A. Okay.
24  Q. Correct. You never received or saw a
25 breakdown of the charges from Tampa, did you?

Page 178

1  A. Yeah.
2  Q. You did?
3  A. I did.
4  Q. Okay. And what was your understanding of what
5  those charges were from --
6  A. Well --
7  Q. -- the shipyard?
8  A. Well, this is your, or mine?
9  Q. No, mine.
10 A. Okay. You overpaid what you get what you paid
11 for.
12 Q. Okay. I don't understand. Explain that to
13 me.
14 A. In other words, is you went to a yard and they
15 pretty much sucked you pretty much dry for shitty --
16 well, depending on the service you provided there, I
17 don't think I would have went back there and paid for
18 that -- that mess that what they made to the -- the
19 vessel and the barge.
20 Q. Okay. And just to be clear, all that work was
21 done prior to your time at RCM, correct?
22 A. Yes, sir.
23 Q. Okay. And you weren't part of any of the
24 negotiation of those bids, quotes, scope of work,
25 invoices, or payments, correct?

Page 179

1  A. Where? In Tampa?
2  Q. In Tampa.
3  A. Yes. But I bid -- I got some of those
4  invoices, that were brought to my attention, and I did
5  check them all, see what issues were they. And some of
6  those issues were still provided to what -- what needed
7  to be done in -- here in Galveston.
8     So I had to reach out to the customer and say,
9  hey, man, when are you going to send me a -- a warranty
10 job over here, and they refused to -- not to send
11 somebody. So that's how -- the reason we started
12 committing with third parties here in Galveston.
13    And in other words, we forgot to pay people
14 down in -- in Florida. That's musunderstanding.
15 Q. Okay. Were you tasked with following up on
16 outstanding invoices, or payment of invoices, or
17 tracking the payments of invoices from the work in
18 Tampa?
19 A. Yes, sir.
20 Q. Okay. And what did you do to -- to solve
21 those invoices?
22 A. To solve, reached out to them. Hey, I still
23 have issues with that. Well, here's a vendor, ADR,
24 that did the repairs for our diesel engines.
25    We had fill -- fill in oil pan. Heads were

Page 180

1  leaking on generators, main engines on pump engines.
2  Even including the work of Rebekah Rose were leaking,
3  spitting oil out of there.
4     They forgot to do load testings. And when I
5  reached out to them to say, hey, man, can you give me a
6  warranty job out here in Galveston, they choose not to
7  come.
8  Q. Okay.
9  A. Why? Because you know -- you know the answer
10 for that.
11 Q. Mr. Balderas, in all this talk about Exhibit
12 40 --
13 A. Okay.
14 Q. -- does that -- has that refreshed your
15 recollection since I previously asked you about why you
16 would have forwarded this series of privileged and
17 confidential communications between RCM personnel and
18 their attorney to Mr. Bowman and Ms. Snorgrass?
19 A. Well, I never -- I never forward none of those
20 documentations. That's the first time I've seen them
21 since -- since the first time I've seen them on my
22 computer.
23 Q. Okay. Understood.
24 A. So it seemed like those -- just to be --
25 Q. Hold -- hold on. I don't have a question

